[Cite as *State v. Ritchey*, 2023-Ohio-1625.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## GEAUGA COUNTY

STATE OF OHIO,

   Plaintiff-Appellee,

- vs -

GAIL M. RITCHEY,

   Defendant-Appellant.

**CASE NO. 2022-G-0025**

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2019 C 000083

### O P I N I O N

Decided: May 15, 2023
Judgment: Affirmed

*James R. Flaiz*, Geauga County Prosecutor, and *Nicholas A. Burling*, Assistant Prosecutor, Courthouse Annex, 231 Main Street, 3rd Floor, Chardon, OH 44024 (For Plaintiff-Appellee).

*Mark B. Marein* and *Steven L. Bradley*, Marein & Bradley, 222 Leader Building, 526 Superior Avenue, Cleveland, OH 44114, and *Edwin V. Hargate*, 38106 Third Street, Willoughby, OH 44094 (For Defendant-Appellant).

MATT LYNCH, J.

{¶1} Defendant-appellant, Gail M. Ritchey, appeals her conviction for Murder. For the following reasons, Ritchey's conviction is affirmed.

{¶2} On June 6, 2019, the Geauga County Grand Jury returned an Indictment charging Ritchey with Aggravated Murder, a felony in violation of R.C. 2903.01(A), and Murder, a felony in violation of R.C. 2903.02(A). The charges were tried before a jury between March 28 and April 4, 2022. The following relevant testimony was presented at trial:

{¶3} Cheryl Jenkins testified that, while delivering newspapers on the morning of March 25, 1993, she discovered the body of a baby on a road in Geauga County. The body was in "bad shape": "he was missing an arm and a leg and the skin on his belly." She contacted law enforcement.

{¶4} Scott Neihus, the Chief of Police for Chardon, testified that in 1993 he was a detective in the Geauga County Sheriff's Office. On March 25 of that year, he responded to a report that the body of an infant had been discovered on Sidley Road in Thompson Township. Neihus accompanied the infant to Geauga Hospital where he was pronounced dead and then transferred to the Cuyahoga County Coroner's Office for autopsy. Several days later, Neihus discovered a garbage bag in the tree line of Mosley Road, "approximately two to three-tenths of a mile" from the location of the body. The bag had been torn open and inside was a clear plastic bag containing a red liquid.

{¶5} Doctor Joseph Felo, the Chief Deputy Medical Examiner for Cuyahoga County, testified as an expert in the field of forensic pathology to the following: Doctor Robert Challener, now deceased, was the Chief Deputy Coroner for Cuyahoga County who performed the autopsy of the child. Felo reviewed the autopsy protocol prepared by Challener as well as microscopic slides of body tissues, toxicology and x-ray reports, and autopsy photographs. Two anatomic diagnoses were made: "full term live born male infant" and "postmortem injuries of head, neck, trunk and extremities." Based on Challener's autopsy, the Geauga County Coroner classified the death as a "homicide" and identified the cause of death as "undetermined violent cause."

{¶6} Using a photograph of the right lung (except for "hilar remnants," the left lung was missing), Dr. Felo opined: "Based on the color and the circumstances, it gives

2

an indication that this child breathed for some time because when the lungs are in the womb, they are going to be more of a brown color and collapsed, much like the color of the liver.  So the fact that there is a more pink color means that the blood that was normally present there has now been pushed out to allow for the air sacs to expand, so the color helps with determining that this child was born alive or took a breath.  * * *  The surface of the lung has a very uniform color, so it's not blotchy or patchy which would be, with the uniform color, would be the child breathed and it expanded the lungs and squeezed out the blood that was in there while the child was developing in the womb, so now it's replaced with air.  Had this been forced air into the lungs, it would be more of a splotchy brown separated by the pink color.  So that uniform color indicates breathing."

{¶7}    Considering Dr. Challener's microscopic examination of the lung tissue, Dr. Felo testified: "Portions are well aerated; that means air has gotten into the air sacs and distended them.  The scattered squames are the skin cells that are from the fetus while in the womb.  They get shed off and into the amniotic fluid which is the fluid that bathes the baby while developing in the womb, so some of those are present in the air spaces.  And then [Dr. Challener] describes atelectasis, that's collapsed or non-expanded air sacs."

{¶8}    Dr. Felo independently reviewed the three existing slides of lung tissue from the child.  He concluded:

> [L]ess than 5 percent of all lung tissues consist of non-expanded air spaces primarily in the subpleural regions; that's my microscopic description of atelectasis; so those are areas of the lungs that did not get air introduced into them into the sacs and they are mostly at the furthest away areas.  When we breathe in it goes to the pleural surface; that's the outer surface of the lungs.  Those are areas that the air is least likely to get in, so that's not surprising.  And that was less than 5 percent of all of the tissues I looked at.  * * *

3

Case No. 2022-G-0025

[A]pproximately 40 percent of all lung tissues consist of rounded and distended optically clear air spaces. What that means is those are the alveolar sacs which is where the business of the lung- where air which has oxygen exchange[s] with blood circulating through the body so that we breathe in oxygen and we expel carbon dioxide; that's what the alveoli, the alveolar air sacs are. About 40 percent of those are rounded and distended; that means they are over-expanded and they have been cleared out of any debris which would be normal in the lung tissues. My third conclusion is that approximately 55 percent to 60 percent of all lung tissues consist of non-distended open air spaces and almost all have cellular and acellular eosinophilic material within the air spaces. What that means is the majority of the lung tissues have open air spaces caused by the child breathing and they're not over-distended. They are not collapsed. These are evidence that this child breathed. And almost all of them have acellular and cellular eosinophilic, which means pink underneath the microscope, material. Those cells are normal cells that help secrete liquid to keep the air sacs open and there's also some debris which is from the amniotic fluid that Doctor Challener specifically called squames. So that is normal air sacs for an infant of certainly less than 24 hours of life. And then finally I say that all lung tissues are well preserved; that means that there's no signs of decomposition or breakdown with no evidence of autolysis which is the chemical breakdown and/or no bacterial colonies which is something that often will occur in body tissues. The bacteria, as I described, can colonize and breakdown the tissues. There's no evidence of that type of decomposition change.

{¶9} With respect to the 40 percent of the tissues that were "rounded and distended," Dr. Felo explained that this can be caused by "forced air into the lungs" or "bacterial overgrowth [which] can cause gasses to form." The lack of evidence of decomposition precluded the possibility of bacterial overgrowth causing the distention.

{¶10} With respect to the 55 to 60 percent of "non-distended open air spaces," Dr. Felo explained this was indicative of passive or normal breathing: "It's not too much air coming in where it's getting over-expanded but it's enough air so that it opens up those air spaces."

4

Case No. 2022-G-0025

{¶11} Based on the foregoing, Dr. Felo asserted to a reasonable degree of scientific certainty that it was a live birth of a near or full term infant. Felo could offer no opinion as to how long the baby was alive or how long the baby had been exposed. He described the child's life as "not long" which could mean seconds or hours.

{¶12} Don Seamon, a detective with the Geauga County Sheriff's Office, testified that, in 2018, the effort was undertaken to use DNA from the child's tooth bud and compare it with online DNA databases in order to determine the child's family. Eventually, through such efforts, law enforcement was able to identify Ritchey as the mother of the child.

{¶13} Detective Seamon interviewed Ritchey and a videorecording of that interview was played for the jury. In the interview, Ritchey (age 23 at the time of birth) stated that she did not realize that she was pregnant until about three months prior to delivery, when she ceased to menstruate. She was unaware of how far along she was in the pregnancy. She did not tell anyone that she was pregnant. She was working for a family as a nanny in Shaker Heights. During a weekday in "winter," she gave birth at the Shaker Heights residence. She did not look at the child and was not aware of its sex. She does not remember if the child moved or made any noise although it was "possible" the child might have done so. Not knowing what to do, she put the child in a garbage bag and put the bag in the trunk of her car. Several days or a week later she spent a weekend at Camp Koinonia in Ashtabula County. During the weekend she drove someplace "I don't know where" and laid the bag in the woods. She was not aware that the child had been found until the police contacted her parents as part of their genealogical investigation.

5

{¶14} Doctor Kent Harshbarger, the Montgomery County Coroner, testified that he examined Dr. Challener's autopsy report and the associated materials from the Cuyahoga County Coroner's Office. Considering these materials, Harshbarger concluded that it was not possible to determine whether the child was born alive. He noted that there have been documented instances of "stillbirth with expanded alveoli" and "known live birth with collapsed alveoli." Accordingly, the microscopic evaluation of lung tissue is not determinative. "Breathing, having expanded alveoli microscopically in my opinion is a useful data point but it is unreliable when all the other markers we use or other markers we typically have available to us allow for greater confidence by doing that [sic]. * * * In this case * * * we don't have many data points, other than the lung histology, and in my opinion that's not enough to conclude [with] reasonable scientific certainty that a live birth occurred."

{¶15} Dr. Harshbarger did not believe that the photograph of the right lung presented "a macroscopic or visual appears [sic] of a healthy, aerated, pink, expanded lung." Although a portion of the lung presented a "lighter red-pink color" consistent with expansion, there was no description in the coroner's report of the organ's texture which is "the only way to evaluate the histologic appearance or microscopic appearance." Dr. Harshbarger noted a number of ways in which the alveoli could be expanded artificially, such as by bacterial gasses or by compression of the chest which could occur during birth or through animal activity. Overall, he did not believe the lung's collapsed appearance was indicative of a live birth.

{¶16} On April 4, 2022, the jury returned a verdict, finding Ritchey not guilty of Aggravated Murder and guilty of Murder.

6

Case No. 2022-G-0025

{¶17} On May 24, 2022, the trial court sentenced Ritchey to an indefinite prison term of fifteen years to life.

{¶18} On June 22, 2022, Ritchey filed a Notice of Appeal. On appeal, she raises the following assignments of error:

> [1.] The evidence was insufficient to sustain the conviction because there was insufficient evidence of venue laying in Geauga County.
>
> [2.] The trial court erred when it instructed the jury that venue should be determined by the location where the body was recovered.
>
> [3.] The trial court erred when it permitted the State's expert witness to testify to his opinion that there was a live birth.
>
> [4.] The trial court erred when it refused to allow the defense to present evidence of dissociative disorder.
>
> [5.] The trial court erred when it permitted Dr. Felo to testify based on information gathered by non-testifying experts and analysts.
>
> [6.] The guilty verdict for Murder was against the manifest weight of the evidence.

{¶19} The first two assignments of error will be considered jointly.

{¶20} "Under Article I, Section 10 and R.C. 2901.12, evidence of proper venue must be presented in order to sustain a conviction for an offense." *State v. Hampton*, 134 Ohio St.3d 447, 2012-Ohio-5688, 983 N.E.2d 324, ¶ 20. "Although it is not a material element of the offense charged, venue is a fact which must be proved in criminal prosecutions unless it is waived by the defendant." *State v. Headley*, 6 Ohio St.3d 475, 477, 453 N.E.2d 716 (1983). "[I]t is not essential that the venue of the crime be proven in express terms, provided it be established by all the facts and circumstances in the case, beyond a reasonable doubt, that the crime was committed in the county and state as

7

alleged in the indictment." *Hampton* at ¶ 19, quoting *State v. Dickerson*, 77 Ohio St. 34, 82 N.E. 969 (1907), paragraph one of the syllabus.

{¶21} There is a statutory exception to the constitutional mandate that a defendant be tried in the county in which the offense is alleged to have been committed. "When the offense involves the death of a person, and it cannot reasonably be determined in which jurisdiction the offense was committed, the offender may be tried in the jurisdiction in which the dead person's body or any part of the dead person's body was found." R.C. 2901.12(J); *State v. Tinch*, 84 Ohio App.3d 111, 120, 616 N.E.2d 529 (12th Dist.1992) ("Section 10, Article I and R.C. 2901.12(J) do not conflict with each other; rather, the statute is a necessary exception to Section 10, Article I that becomes applicable only in the event it cannot reasonably be determined in which jurisdiction an offense involving the death of a person was committed").

{¶22} "Over a century of well-established jurisprudence clearly mandates that a motion for judgment of acquittal must be granted when the evidence is insufficient for reasonable minds to find that venue is proper." *Hampton* at ¶ 24. Legally sufficient evidence is evidence that, as a matter of law, satisfies the legal standard applicable to a given issue. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "Ohio has required proof of venue beyond a reasonable doubt to sustain a conviction." *Hampton* at ¶ 22. "[A] conviction based on legally insufficient evidence constitutes a denial of due process." *Thompkins* at 386.

{¶23} In the present case, Ritchey's Indictment reads as follows: "THE JURORS OF THE GRAND JURY * * * do find and present that on or about March of 1993, at Geauga County, Ohio, GAIL M. RITCHEY * * * did purposely, and with prior calculation

8

and design, cause the death of another" and "that GAIL M. RITCHEY on or about March of 1993 at Geauga County, Ohio, did purposely cause the death of another * * *."

{¶24} The State argued that venue was proper based on the discovery of the body in Geauga County pursuant to R.C. 2901.12(J). On that ground, the trial court denied Ritchey's motion: "I've determined that venue is proper given the parameter of the statute. And I do this because I believe that it couldn't be determined with reasonable certainty the site of the alleged crime. The only evidence is the interview with the police; that wasn't sworn testimony, and there's been no corroborating evidence presented that it definitively happened in Shaker Heights. So, I believe that the State had no realistic option but to bring the charges in Geauga County as the statute would permit."

{¶25} The jury was subsequently instructed as follows with respect to venue: "Before you can decide whether the State of Ohio has proved beyond a reasonable doubt all the essential elements of the offenses with which the defendant is charged, you must first decide whether this is the correct county in which this trial should be held. The State must prove beyond a reasonable doubt that Baby Boy Doe's body or a part of his body was found in Geauga County, Ohio."

{¶26} On appeal, Ritchey challenges the trial court's determination that it could not be reasonably determined in which jurisdiction the offense was committed and argues that this issue is one that should be submitted to the jury for determination. We will consider the second argument first.

{¶27} The parties have cited no authority on the issue of whether it is properly for the jury to determine whether the jurisdiction in which the offense was committed can be reasonably determined. We conclude that this determination is to be made by the trial

9

court, while the jury is responsible for the factual determination of where the body was found.

{¶28} We begin with the propositions that "[t]rial courts have broad discretion to determine the facts that would establish venue," while "venue is a fact that must be proved beyond a reasonable doubt," i.e., by the jury or trier of fact. *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, ¶ 144, 143. These contrasting standards reflect "the distinction between the determination of where venue is proper and proof of venue at trial." *State v. Barr*, 158 Ohio App.3d 86, 2004-Ohio-3900, 814 N.E.2d 79, ¶ 15 (7th Dist.). Stated otherwise, "[t]he trial court determines whether a case is properly venued in its court." *State v. DeBoe*, 6th Dist. Huron No. H-02-057, 2004-Ohio-403, ¶ 42. "The jury then determines whether sufficient evidence has been presented to establish venue * * *." *Id.*

{¶29} Applying these considerations to R.C. 2901.12(J), it is within the trial court's discretion to determine whether the jurisdiction in which the offense was committed can be reasonably determined, i.e., whether the case has been properly venued in its court. This is a preliminary consideration which is appropriately determined in anticipation of trial. Moreover, the exercise of discretion comports well with a standard of reasonableness. *Compare State v. Miller*, 11th Dist. Lake No. 2019-L-084, 2020-Ohio-3329, ¶ 9 (defining abuse of discretion as a "judgment * * * which does not comport with reason or the record" and as the "failure to exercise sound, reasonable, and legal decision-making"). On the other hand, it is for the jury to determine whether the body or a part thereof had been found within the jurisdiction, i.e., whether the evidence of venue has been established beyond a reasonable doubt.

10

Case No. 2022-G-0025

**{¶30}** The foregoing approach is also consistent with the relevant instruction on venue contained in the Ohio Jury Instructions:

> Before you can decide whether the state of Ohio has proved beyond a reasonable doubt all of the essential elements of the offense(s) with which the defendant is charged, you must first decide whether this is the correct (county) (*other jurisdiction*) in which this trial should be held. The state must prove beyond a reasonable doubt that (*insert name of deceased person*)'s body or any part of his/her body was found in _____ (County) (*other jurisdiction*), Ohio.

Ohio Jury Instructions, CR Section 413.07 (Rev. May 21, 2022). Although not controlling, this court has held that "[t]he Ohio Jury Instructions are authoritative and are generally to be followed and applied by Ohio's courts." *State v. Varner*, 2020-Ohio-1329, 153 N.E.3d 514, ¶ 54 (11th Dist.); *State v. Miranda*, 11th Dist. Lake No. 2014-L-020, 2014-Ohio-5312, ¶ 24 (Ohio Jury Instructions are "persuasive, if not controlling").

**{¶31}** We note that the application of R.C. 2901.12(J) in the present case was complicated by the State's failure to properly plead venue in the Indictment. As a result, Ritchey had no reasonable opportunity to challenge whether the case had been properly venued until the close of the State's case through a motion for acquittal based on sufficiency of the evidence. Otherwise, a pretrial motion to challenge venue could have been raised. It is also worth noting, as counsel for Ritchey pointed out, that venue based on a course of conduct as provided for in R.C. 2901.12(H) could have been readily established if she had also been charged with Abuse of a Corpse.

**{¶32}** We now consider whether the trial court abused its discretion in ruling that it could not be reasonably determined where the offense was committed. Ritchey notes that the evidence of her recorded interview establishes that, in 1993, she lived and worked in Cuyahoga County and that the birth occurred in Shaker Heights. Her employment as

11

a nanny for a family in Shaker Heights was confirmed by law enforcement. Dr. Felo testified that the child only lived a matter of minutes or hours and Ritchey did not abandon the body in Geauga County until days after giving birth. The State counters that, while Ritchey's employment in Shaker Heights could be verified, the actual birth at that residence could not be. Moreover, the State maintains Ritchey's statements in her interview are not reliable. She claimed that no one else was present for the birth. However, the presence of distended alveoli in the lung is indicative of someone having performed rescue breathing on the child prior to his death. If Ritchey had done so, she would have admitted as much during her interview. Accordingly, her statements are unreliable.

{¶33} We find no abuse of discretion. Not only are Ritchey's statements regarding the birth uncorroborated but, after the passage of almost thirty years, they are no longer capable of corroboration. Moreover, the nature of the statements made during the interview was uncertain. Ritchey was not aware she was pregnant for most of her pregnancy. She did not recall when the birth took place except that it was "winter." Rather than affirmatively stating that the child was stillborn, she claimed not to have noticed if the child moved or made a noise. She did not know exactly how long the child was in her trunk before abandoning the body someplace she likewise did not know. Given this context, it was not at all reasonably certain that the place of birth was the one detail that Ritchey reported with either accuracy or truthfulness. *Compare State v. Zich*, 6th Dist. Lucas No. L-09-1184, 2011-Ohio-6505, ¶ 143 ("although there was evidence suggesting that a struggle occurred * * * in Ottawa County, there was no evidence that the victim died in this struggle").

12

Case No. 2022-G-0025

{¶34} The first two assignments of error are without merit.

{¶35} In the third assignment of error, Ritchey argues that the trial court erred by allowing Dr. Felo to testify regarding his opinion that there was a live birth based on microscopic examination of the lung tissue. Ritchey maintains that Dr. Felo's testimony did not meet the admissibility standard set forth in Evidence Rule 702 in addition to offending constitutional principles of due process.

{¶36} Prior to trial, Ritchey filed a Motion for Daubert Hearing to Determine Scientific Reliability of Microscopic Examination of Lung Tissue and Opinions Based Thereon. The trial court denied the Motion following a hearing on January 20, 2022.

{¶37} "A trial court's ruling on evidentiary issues, including the admissibility of expert opinions, will not be reversed on appeal absent an abuse of discretion and proof of material prejudice." *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 116; *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, ¶ 16 ("[t]rial courts have broad discretion in determining the admissibility of expert testimony, subject to review for an abuse of discretion").

{¶38} A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

13

Case No. 2022-G-0025

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

Evid.R. 702.

{¶39} In applying these criteria, the Supreme Court of Ohio has established the following principles:

In determining whether the opinion of an expert is reliable under Evid.R. 702(C), a trial court examines whether the expert's conclusion is based on scientifically valid principles and methods. *Miller* [*v. Bike Athletic Co.*], 80 Ohio St.3d 607, 687 N.E.2d 735 [(1988)], paragraph one of the syllabus. A court should not focus on whether the expert opinion is correct or whether the testimony satisfies the proponent's burden of proof at trial. *Id.* Accordingly, we are not concerned with the substance of the experts' conclusions; our focus is on how the experts arrived at their conclusions. * * * Because even a qualified expert is capable of rendering scientifically unreliable testimony, it is imperative for a trial court, as gatekeeper, to examine the principles and methodology that underlie an expert's opinion. Cf. *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.E.2d 469 ("under [Fed.R.Evid. 702] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable"); *Gen. Elec. Co. v. Joiner* (1997), 522 U.S. 136, 142, 118 S.Ct. 512, 139 L.E.2d 508 (discussing the gatekeeping role of the trial judge under Fed.R. Evid. 702). * * * Evid.R. 702(C) requires not only that those underlying resources are scientifically valid, but also that they support the opinion. Although scientists certainly may draw inferences from a body of work, trial courts must ensure that any such extrapolation accords with scientific principles and methods. * * * In *Joiner*, the United States Supreme Court, in discussing the reliability requirements of Fed.R.Evid. 702, stated, "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. at 146, 118 S.Ct. 512, 139 L.Ed.2d 508.

*Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, ¶ 16-18.

14

{¶40} On appeal, Ritchey contends that Dr. Felo's conclusions did not meet these standards for admissibility. She argues that Dr. Felo's "use of microscopic examination as a sole basis for determining live birth has not been tested, is not supported by peer-reviewed or published articles, has no known error rate (in this regard, Felo said that he needed more than 20 percent of the alveoli to be passively aerated but less than 50 percent, but offered no explanation for these figures), and is not generally accepted (indeed, the literature is critical of microscopic analysis as the sole criteria, as testified to by Felo)." Amended Merits Brief of Appellant at 21-22.

{¶41} At the hearing, Dr. Felo testified that there are "characteristics and classic tissue changes that differentiate between a stillborn, child that is dead upon delivery of the infant, and a live born, meaning that they took a breath outside of the mother's womb." According to Dr. Felo, the determinative characteristic is "the expansion of the small air spaces," i.e., the "alveoli, the air sacs." The expansion of these air sacs is indicative of independent breathing (described as "passive aeration") and, thus, of live birth.

{¶42} Ritchey emphasizes the lack of published articles or studies to support Dr. Felo's conclusions. Dr. Felo, acknowledging the lack of supportive literature, explained that his conclusions are largely based on his own experience of having performed about 200 infant autopsies:

> Having looked at both stillborn tissues and neonate tissues, these tissues of the lungs [55-60 percent of Baby Boy Doe's tissues] more mimic a neonate, meaning a live birth based on the air spaces are not collapsed and * * * they're open. Whereas a stillborn * * *, the definite stillborns that I've done, * * * all of the tissues are collapsed. They are not filled with air.

{¶43} With respect to the scientific literature, Dr. Felo explained that it was more anecdotal than systemic in nature:

15

Case No. 2022-G-0025

[T]here are several case reports more like I have a case I'm going to present it to the medical community, the pathology community, and * * * this is what I found. So there's not really controlled tests where we can take ten fetuses, have them die, and look at their lung tissues. And have ten fetuses, have them sit out decomposing, and look at their tissues. So most of the literature was, what I'm aware of, is just individual experiences and case reports. And I rely on that when I make my own diagnoses. I've certainly had many cases of stillborn deaths when I've known they have been stillborn. I've had abandoned bodies that later on, after I ruled that they were live birth[s], that the defendant said, yes, they were live birth. * * * So that's what I base a lot of my experience and my diagnoses on is my experience and the experience that I was taught and plus the experience of my colleagues at work. There [are] nine other pathologists that I show tissues to and they show me tissues too. * * * So what we're left with is essentially practicality as far as making a diagnosis and that practicality comes from experience. * * * [T]here's not a whole lot of literature on was the child born dead or alive. * * * [A] lot of that literature is: It's difficult. You have to make a diagnosis with caution. * * * Yes, I reviewed those articles but I also have to go back with my experiences in how I have had similar cases and dissimilar cases and put all that together to formulate my diagnoses.

{¶44} Ritchey also challenges Dr. Felo's conclusions on the ground that the lung tissues could have been aerated postmortem. As Dr. Felo acknowledged during the hearing, air could be introduced into the lungs through decomposition, animal activity, or autopsy manipulation. Dr. Felo addressed those contingencies at the hearing and explained, in turn, why he did not believe they compromised his diagnosis:

There's no signs of decomposition which could distend the tissues with gas formation, meaning there's no bacteria that are present that would fester and cause gas to expand the tissues. You know, the animal activity, if anything, it's going to introduce the bacteria from the saliva and there's no evidence of that. Crushing and tearing is going to collapse the tissues. It's not going to expand them. And much like * * * manipulation of the tissues at the autopsy, you'd really have to stretch out and expand the tissues to make it even appear that they're filled with gasses. We're talking at the microscopic level here where it's pretty well preserved from the time of autopsy until the time of evaluation microscopically.

16

{¶45} Finally, Ritchey claims Dr. Felo's opinion is fundamentally unreliable because it is not known from where the slides or tissue samples on which the opinion is based were taken. In other words, Ritchey claims that it cannot be established that the tissue samples are representative of the condition of the lung as a whole. Again, Dr. Felo acknowledges that it is impossible to identify precisely the origin of the three samples (although two of them contained pleura or tissue from the lung's outer surface). Nonetheless, he was confident the samples were sufficiently representative. He noted that "microscopically * * * there is a variety of the [lung] tissues that have been sampled." Moreover, Dr. Felo was trained by Dr. Challener and was familiar with his style: "if there were three lobes, he would take tissues from three lobes; that's how he taught me to do that; that's how I already knew how to do that from my general pathology training, but that's * * * how he practiced."

{¶46} Dr. Felo recognized the lack of scientific studies or literature that would corroborate (or contradict) his conclusions. In this respect, we note the following:

> The rule [Evid.R. 702] provides that a witness qualified as an expert by knowledge, skill, experience, training or education may have her testimony presented in the form of an opinion or otherwise and it need not be just scientific or technical knowledge. The rule includes more. The phrase "other specialized knowledge" is found in the rule and, accordingly, if a person has information which has been acquired by experience, training or education which would assist the trier of fact in understanding the evidence or a fact in issue and the information is beyond common experience, such person may testify.

*State v. Boston*, 46 Ohio St.3d 108, 118, 545 N.E.2d 1220 (1989).

{¶47} Based on the foregoing record, the trial court deemed Dr. Felo's opinion testimony admissible. We find no abuse of discretion. Fundamentally, Dr. Felo's methodology is sound. There is nothing in the record to contradict the basic premise of

17

his opinion that open air sacs, observed microscopically, are indicative of passive breathing which, in turn, is consistent with a live birth. The issue, then, is whether the presence of 55-60 percent open air sacs is sufficient by itself to make that diagnosis and/or whether other factors, such as decomposition or foreign manipulation, undermine that diagnosis. Ultimately, these are considerations for the jury to resolve. The Supreme Court of Ohio has observed that "scientific opinions need not enjoy 'general acceptance' in the relevant scientific community in order to satisfy the reliability requirement of Evid.R. 702," and "there need not be any agreement in the scientific community regarding the expert's actual opinion or conclusion." *State v. Nemeth*, 82 Ohio St.3d 202, 210, 694 N.E.2d 1332 (1998). "The credibility of the conclusion and the relative weight it should enjoy are determinations left to the trier of fact." *Id.*

{¶48} The third assignment of error is without merit.

{¶49} In the fourth assignment of error, Ritchey argues that the trial court erred by refusing to allow the defense to present evidence of dissociative disorder.

{¶50} Prior to trial, Ritchey produced in discovery an expert report prepared by Dr. Diane Lynn Barnes "about pregnancies that are unperceived, often referred to pervasive pregnancy or pregnancy concealment," and one of the "hallmarks of this reproductive aberration," dissociative disorder. The State filed a motion in limine to exclude from evidence at trial the testimony and expert report of Dr. Barnes on the grounds that it constituted inadmissible evidence of "diminished capacity." The trial court granted the State's motion on March 7, 2022.

{¶51} The State maintains that "[t]he only potential use for Dr. Barnes' report and testimony would be to argue to the jury that Ritchey could not form the specific mental

18

state [purposely] at the time of the offense." Brief of Appellee at 21. "[W]hen a defendant does not assert an insanity defense, it is well settled that he may not offer expert testimony in an effort to show that he lacked the mental capacity to form the specific mental state required for a particular crime." *State v. Fulmer*, 117 Ohio St.3d 319, 2008-Ohio-936, 883 N.E.2d 1052, ¶ 67; *State v. Wilcox*, 70 Ohio St.2d 182, 436 N.E.2d 523 (1982), paragraph two of the syllabus. Diminished capacity has been described "as arising when 'a sane defendant's mental abnormality at the time of the crime prevented him from entertaining the specific mental state prescribed by statute.'" (Citation omitted.) *State v. Huertas*, 51 Ohio St.3d 22, 27, 553 N.E.2d 1058 (1990), fn. 5. "To allow psychiatric testimony on specific intent would bring into Ohio law, under another guise [such as "conduct disorder"], the diminished capacity defense * * * rejected in *Wilcox*." *State v. Cooey*, 46 Ohio St.3d 20, 26, 544 N.E.2d 895 (1989); *Fulmer* at ¶ 69.

{¶52} Ritchey counters that Dr. Barnes' testimony was proffered for two reasons unrelated to diminished mental capacity: "The first purpose of this testimony was to explain why and how Gail Ritchey, after delivery, could transition almost immediately to caring for the children for which she was a nanny. * * * The second purpose was also unrelated to mental capacity. The dissociative statute about which Dr. Barnes would have opined affects the voluntariness of actions, not mental status." Amended Merits Brief of Appellant at 23. Ritchey further relies on the lead opinion in *State v. Ireland*, 155 Ohio St.3d 287, 2018-Ohio-4494, 121 N.E.3d 285, which held that blackout, as evidenced by the defendant's experiencing "a dissociative episode" due to PTSD at the time of an alleged assault, was an affirmative defense for which the defendant bore the burden of proof at trial. *Id.* at ¶ 1, 3.

19

Case No. 2022-G-0025

{¶53} We find no abuse of discretion in the trial court's decision to exclude the report and testimony of Dr. Barnes. With respect to the first argument, evidence as to how Ritchey could function as a nanny after giving birth is not relevant to the issues in this case.

{¶54} With respect to the claim that the evidence was relevant and probative of the voluntariness (actus reus) of Ritchey's actions, the claim is undermined by the substance of the expert report. Dr. Barnes opined: "A dissociative episode affects consciousness to the degree that it impairs the ability to respond effectively to what is happening in the present. This psychological disconnect caused by a dissociative episode has a marked effect on rational thought and decision-making. Dissociation strips the individual of the ability to problem-solve and/or form any kind of intention." As described by Dr. Barnes, dissociative disorder does not simply produce involuntary physical actions, but clearly diminishes the actor's capacity to appreciate the import of those actions. It is a "psychological disconnect" from reality rather than being akin to a state of unconsciousness associated with blackout. *Compare* R.C. 2901.01(A)(14) ("[a] person is 'not guilty by reason of insanity' * * * if the person proves, * * * that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts") *with* R.C. 2901.21(F)(2) ("[r]eflexes, convulsions, body movements during unconsciousness or sleep, and body movements that are not otherwise a product of the actor's volition, are involuntary acts").

{¶55} Elsewhere in the report, Dr. Barnes does describe dissociation as analogous to being in a dream-like state and/or experiencing a loss of consciousness: "Dreams make it difficult to discern what is real from what is not, and so the bizarre may

20

not appear odd. Dissociation creates the same disconnect from reality. In dissociation, like in a dream, individuals have no authority or agency over their actions. [I]ndividuals are powerless to change behavior or circumstances during a dissociative episode and can only observe what is occurring with no power to change the scene, regardless of how senseless, disturbing, or perverse it might be." We find Dr. Barnes' descriptions of the dissociative state to be contrasting if not contradictory. On the one hand, the actor is unable "to recognize the magnitude and the gravity of the situation." On the other hand, the "psychological split between body and mind" creates "the sensation of feeling robotic, not in charge of [one's] own behavior." Given the malleable nature of the evidence, as well as the fact that Dr. Barnes' opinion is not based on the facts of the present case or any examination of Ritchey herself, it was certainly within the trial court's discretion to exclude the report and testimony.

{¶56} Finally, we note that *Ireland*, 155 Ohio St.3d 287, 2018-Ohio-4494, 121 N.E.3d 285, has virtually no precedential or persuasive value. The lead opinion holding that PTSD-related blackout was an affirmative defense only represented the position of two justices. The lead opinion absolutely refused to consider the State's argument that the dissociative episode was the functional equivalent of diminished capacity. The State failed to raise the argument at trial or on appeal. "The state's actions go beyond a simple forfeiture of the argument that Ireland raised a diminished-capacity defense," rather, "[t]he state * * * intentionally declined to assert any argument beyond the argument that blackout was not supported by the evidence." *Id.* at ¶ 16. Two other justices concurred with the lead opinion in reversing the court of appeals, but did so on the grounds that, "[i]n the actual context of Ireland's case, the term 'blackout' was used as a placeholder for his

21

insanity-related defense." *Id.* at ¶ 50 (DeGenero, J., concurring in judgment only). Lastly, two justices dissented on the grounds that "a blackout defense is not an affirmative defense but rather serves to negate the voluntary-act element of an offense pursuant to R.C. 2901.21(A)(1). *Id.* at ¶ 100 (Kennedy, J., dissenting). The dissenting justices took no position with respect to the diminished capacity argument.

{¶57} The fourth assignment of error is without merit.

{¶58} In the fifth assignment of error, Ritchey argues that the trial court erred by admitting the 1993 autopsy report generated by Dr. Challener into evidence.

{¶59} Prior to trial, Ritchey filed a motion in limine to exclude from evidence the contents of the autopsy file including the 1993 autopsy report and coroner's verdict. On February 17, 2022, the trial court denied Ritchey's motion with respect to the autopsy report, while the motion was granted with respect to other parts of the file.

{¶60} Ritchey raises two arguments. The first is that the autopsy file is inadmissible hearsay. Ritchey acknowledges that the Supreme Court of Ohio has held: "An autopsy report that is neither prepared for the primary purpose of accusing a targeted individual nor prepared for the primary purpose of providing evidence in a criminal trial is nontestimonial, and its admission into evidence at trial under Evid.R. 803(6) as a business record does not violate a defendant's Sixth Amendment confrontation rights." *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, syllabus. Ritchey maintains, however, that "*Maxwell* incorrectly confined its analysis to Evid.R. 803(6) when its analysis should have been undertaken in light of Evid.R. 803(8)." Additionally, she argues that "the admission of the autopsy file without the accompanying testimony of the person(s) who participated in the autopsy violates the Confrontation Clause of the Sixth

22

Amendment and the corresponding provision in the Ohio Constitution found in Article I, Section 10." Amended Merits Brief of Appellant at 25.

**{¶61}** Evidence Rule 803(8) allows for the admission of "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel * * *." "Ohio courts have held that Evid.R. 803(6) and Evid.R. 803(8) do not permit the State to introduce police records and reports to prove the substance of those records or reports in criminal cases because that procedure violates the hearsay rule and the accused's constitutional right of confrontation." *State v. Wilson*, 8th Dist. Cuyahoga No. 87205, 2006-Ohio-4108, ¶ 23; *State v. Wyke*, 10th Dist. Franklin Nos. 98AP-1084 and 98AP-1085, 1999 WL 731384, *4. Ritchey's argument rests on the supposition that "[t]he coroner and the coroner's employees are law enforcement personnel." In support, she cites R.C. 313.09 ("[t]he sheriff of the county, the police of the city, the constable of the township, or marshal of the village in which the death occurred may be requested to furnish more information or make further investigation when requested by the coroner or his deputy" and "[t]he prosecuting attorney may obtain copies of records and such other information as is necessary from the office of the coroner") and R.C. 313.15 ("[a]ll dead bodies in the custody of the coroner shall be held until such as the coroner, after consultation with the prosecuting attorney, or with the police department * * *, or with the sheriff, has decided that it is no longer necessary to hold such body").

23

**{¶62}** Based on the foregoing, we find that coroners are not police officers or other law enforcement personnel for the purposes of Evidence Rule 803(8). Even if they were, that would not preclude autopsy reports from being admissible as records of regularly conducted activity under Rule 803(6). Police reports which are clearly inadmissible under Rule 803(8) may nonetheless be admitted in some circumstances under Rule 803(6). *See*, *e.g.*, *State v. Lundy*, 8th Dist. Cuyahoga No. 90712, 2008-Ohio-6848, ¶ 27. Whether considered under Rule 803(6) or Rule 803(8), the more significant issue is whether the admission of the autopsy reports violates Ritchey's rights of confrontation.

**{¶63}** Regardless of whether coroners are law enforcement personnel, "there is no doubt that the nature of the coroner's work in a homicide-related autopsy is investigative and pertains to law enforcement" and that "a coroner plays an integral role in law-enforcement investigations." *State ex rel. Cincinnati Enquirer v. Pike Cty. Coroner's Office*, 153 Ohio St.3d 63, 2017-Ohio-8988, 101 N.E.3d 396, ¶ 38. "It cannot be said that the coroner lacks authority to investigate a violation of law when, without the coroner's investigation, a murder could be mistaken for a natural death and no legal violation would be uncovered." *Id.*

**{¶64}** The Supreme Court of Ohio in *Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, considered the constitutional implications of admitting such reports under an exception to the hearsay rules in light of United States Supreme Court precedent. The Ohio high court determined that the "admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is testimonial unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness." *Id.* at ¶ 34, citing *Crawford v.*

24

*Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). "[T]estimonial statements are those made for 'a primary purpose of creating an out-of-court substitute for trial testimony.'" *Id.* at ¶ 40, quoting *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). "If a statement's primary purpose is anything else, the statement is nontestimonial." *Id.* In *Maxwell*, the Ohio Supreme Court reaffirmed prior precedent "that an autopsy report was a nontestimonial business record and that its admission did not impinge on a defendant's confrontation rights." *Id.* at ¶ 54, citing *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 81-88. Thus, the Supreme Court concluded that "an autopsy report that is neither prepared for the primary purpose of accusing a targeted individual nor prepared for the primary purpose of providing evidence in a criminal trial is nontestimonial, and its admission into evidence at trial under Evid.R. 803(6) as a business record does not violate a defendant's Sixth Amendment confrontation rights." *Id.* at ¶ 63.

**{¶65}** The facts of the present case fall under *Maxwell*'s holding. Dr. Challener's autopsy report was not generated with the primary purpose of creating an out-of-court substitute for trial testimony. Rather, Dr. Challener was fulfilling his duties to "keep a complete record of and * * * fill in the cause of death on the death certificate, in all cases coming under his jurisdiction." R.C. 313.09. To this end, "coroners are statutorily empowered to investigate unnatural deaths and authorized to perform autopsies in a number of situations, only one of which is when a death is potentially a homicide." *Maxwell* at ¶ 59. Indeed, an autopsy in the present case was necessarily prerequisite to the opening of a homicide investigation. Given the report itself was properly admitted into

25

evidence, there was no error in Dr. Felo testifying regarding its contents or expressing his own opinion of its findings.

{¶66} Ritchey cites to a later Ohio Supreme Court decision, *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, 123 N.E.3d 955, in which a BCI forensic scientist (Keaton) testified regarding fingerprint exhibits that had been processed by another latent-print examiner (Limpert) who did not testify. *Id.* at ¶ 206. The court held that Limpert's out-of-court statements, as contained in the exhibits, were testimonial and thus the admission of those statements via Keaton's testimony was erroneous. *Id.* at ¶ 213. The basis for the holding in *Tench*, however, is what distinguishes that case from the present one. In *Tench*, "a law-enforcement officer provided [the fingerprint] evidence to a state laboratory set up for the purpose of assisting police investigations." *Id.* at ¶ 213, citing R.C. 109.52 (BCI may operate a criminal-analysis laboratory and "engage in such other activities as will aid law enforcement officers in solving crimes and controlling criminal activity"). By contrast, the court in *Maxwell* found that, "[a]lthough autopsy reports are sometimes relevant in criminal prosecutions, *Craig* rightly held that they are not created primarily for a prosecutorial purpose." *Maxwell* at ¶ 59.

{¶67} Moreover, two years prior to *Tench*, four of the same justices held that there was no Confrontation Clause violation when the State's expert forensic pathologist (Germaniuk) testified as a substitute witness in place of the coroner who performed the victim's autopsy. *State v. Adams*, 146 Ohio St.3d 232, 2016-Ohio-3043, 54 N.E.3d 1227, ¶ 3. This ruling in *Adams* was based directly on the holding in *Maxwell*. "Because the report is itself admissible, Germaniuk's testimony as to its contents is not a Confrontation Clause problem." *Id.* at ¶ 6, citing *Maxwell* at ¶ 51-52. "With respect to Germaniuk's

26

testifying as to his own opinion, '[s]uch testimony constituted [his] original observations and opinions and did not violate the Confrontation Clause, because he was available for cross-examination regarding them.'" *Id.* citing *Maxwell* at ¶ 53.

{¶68} The fifth assignment of error is without merit.

{¶69} In the sixth and final assignment of error, Ritchey argues her conviction for Murder is against the manifest weight of the evidence.

{¶70} "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*." (Citation omitted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). When considering whether a judgment is against the weight of the evidence, "a reviewing court asks whose evidence is more persuasive—the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. The court must consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Citation omitted.) *Thompkins* at 387.

{¶71} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a '"thirteenth juror"' and disagrees with the factfinder's resolution of conflicting testimony."

Case No. 2022-G-0025

(Citation omitted.) *Thompkins* at 387. Nevertheless, "[t]he trier of fact is free to believe or disbelieve all or any of the testimony" and "is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible." *State v. Haney*, 11th Dist. Lake No. 2012-L-098, 2013-Ohio-2823, ¶ 43. "Consequently, although an appellate court must act as a 'thirteenth juror' when considering whether the manifest weight of the evidence requires reversal, it must also give great deference to the fact finder's determination of the witnesses' credibility." (Citation omitted.) *Id.*

{¶72} In order to convict Ritchey of Murder, the State was required to prove, beyond a reasonable doubt, that she "purposely cause[d] the death of another." R.C. 2903.02(A).

{¶73} Ritchey raises two points: "First, Felo's testimony was unreliable and incredible. He acknowledged that his opinion was contrary to that of some experts who believed the determination of live birth could not be based on microscopy. And he could point to no expert treatise or other body of work that supported his conclusion. * * * Second, all evidence pointed to this crime, assuming there was a live birth, having been committed in Cuyahoga County." Amended Merits Brief of Appellant at 27.

{¶74} We do not find Ritchey's conviction to be against the weight of the evidence. For the reasons set forth in the first two assignments of error, the trial court properly found this case to be venued in Geauga County, providing that the jury found that the body was discovered there. There is no real dispute about where the body was found. With respect to Dr. Felo's testimony, we defer to the trier of fact. Dr. Felo set forth coherent and compelling reasons for his diagnosis of live birth. Dr. Harshbarger did not contradict Dr.

28

Felo's findings so much as he found them inadequate for the purposes of making a diagnosis. Dr. Felo identified valid data points, according to Dr. Harshbarger, but not enough of them for a reliable diagnosis. Dr. Harshbarger also believed that there were alternative explanations besides live birth that could explain the histology. Dr. Felo's confidence in his diagnosis was based on the consistency or similarity between the open air sacs in the victim's lungs and the appearance of these sacs in other, known live births. The jury's estimation of the credibility and persuasiveness of these two witnesses does not constitute a manifest miscarriage of justice.

{¶75} The sixth assignment of error is without merit.

{¶76} For the foregoing reasons, Ritchey's conviction for Murder is affirmed. Costs to be taxed against the appellant.

JOHN J. EKLUND, P.J.,

EUGENE A. LUCCI, J.,

concur.